# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| SPENCER RILEY (#B41194), | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | No. 13-cv-02162 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| VICTOR CALLOWAY, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION AND ORDER

Petitioner Spencer Riley, a prisoner at the Danville Correctional Center, brings this habeas corpus petition pursuant to 28 U.S.C. § 2254 to challenge his armed habitual criminal conviction from the Circuit Court of Cook County. Riley argues that his Fifth Amendment guarantee against Double Jeopardy, as explained by the United States Supreme Court in *Ashe v. Swenson*, 397 U.S. 436 (1970), bars his conviction as an armed habitual criminal due to his prior acquittal on a related murder charge. *Ashe* holds that the doctrine of issue preclusion applies in criminal cases pursuant to the United States Constitution's protection against Double Jeopardy. *Bravo-Fernandez v. United States*, 137 S. Ct. 352, 358 (2016) (citing *Ashe*, 397 U.S. 436). When a jury has returned a verdict of not guilty in a criminal case, the Court must determine what the acquitting jury "necessarily decided" to arrive at the verdict and give preclusive effect to those issues in a future trial of that defendant. *Id.* at 359 (citing *Ashe*, 397 U.S. at 444). In this case, the state court concluded that the preclusive effect of Riley's acquittal at his murder trial did not bar his subsequent conviction as an armed habitual criminal. This Court agrees with that decision and thus finds that Riley cannot demonstrate that the state court ruling was contrary to, or an unreasonable

application of, clearly-established federal law. Consequently, the Court denies Riley's petition for a writ of habeas corpus.

## I.    Background

The following facts are drawn from the state court record. (Dkt. Nos. 3-1, 16.) *Ashe* requires the Court to evaluate that record from the perspective of "'realism and rationality,'" "'set in a practical frame and viewed with an eye to all of the circumstances of the proceedings.'" *Id.* at 359 (quoting *Ashe*, 397 U.S. at 444). Furthermore, pursuant to the requirements of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), the state court's findings of fact are presumed correct, and Riley has the burden of rebutting the presumption of correctness by clear and convincing evidence. *Brumfield v. Cain*, 135 S. Ct. 2269, 2282 n.8 (2015) (citing 28 U.S.C. 2254(e)(1)).

Cedric Hudson (also known as "G-Loe") was shot multiple times on the evening of October 30, 2007, in a vacant lot in Chicago's Englewood neighborhood. *Illinois v. Riley*, No. 1-10-1607, 2012 IL App (1st) 101607-U, at 2-3 (Ill. App. Ct. June 28, 2012) (Dkt. No. 3-1 at 3-4). Riley was charged with Hudson's murder, as well as being an armed habitual criminal. *Riley*, No. 1-10-1607, 2012 IL App (1st) 101607-U, at 2 (Dkt. No. 16-1 at 27-34). The murder and armed habitual criminal charges were severed, with Riley's jury trial on the murder charge occurring first. *Riley*, No. 1-10-1607, 2012 IL App (1st) 101607-U, at 2 (Dkt. No. 16-3 at 7).[1]

---

[1] Petitioner was indicted for both murder and being an armed habitual criminal in a single grand jury indictment. (Dkt. No. 16-1 at 27-34). This is consistent with Illinois's compulsory joinder statute, which requires multiple offenses arising out of a single act to be prosecuted in a single prosecution. 720 ILCS 5/3-3(b). The "compulsory joinder statute 'was enacted to prevent the prosecution of multiple offenses in a piecemeal fashion and to forestall, in effect, abuse of the prosecutorial process.'" *Illinois v. Hunter*, 986 N.E.2d 1185, 1190 (Ill. 2003) (quoting *Illinois v. Quigley*, 697 N.E.2d 735, 738 (Ill. 1998)). "A prosecutor might otherwise harass a defendant through successive prosecutions of multiple offenses and put a

## A.	The Murder Trial

The evidence at the murder trial showed that at 10:43 p.m. on the night of Hudson's killing, a Chicago police officer heard several gunshots. (Dkt. No. 16-4 at 28-29.) The officer drove one block to a vacant lot where he found Hudson lying face-down in the dirt, having been shot multiple times. *Id*. at 31. The lot was not very well lit but there were streetlights in the area. *Id*.

A police crime scene investigator recovered a .380 cartridge from the vacant lot. (Dkt. No. 16-5 at 70.) He also found several plastic cups and bottle, including a plastic cup close to Hudson's body. *Id.* at 67-68. A second responding police officer recovered a fired bullet from under Hudson's shirt. *Id*. at 110. No gun was found at the scene. Indeed, the police were unable to recover the gun that killed Hudson at any point during their investigation. But Hudson's autopsy revealed that he had been shot six times. *Id*. at 81. Several bullets and bullet fragments were recovered from Hudson's body during the autopsy. *Id*. at 82. The autopsy also showed that Hudson's blood alcohol level was 0.16. *Id*. at 93.

An Illinois State Police forensic scientist examined the firearms evidence recovered from the crime scene and autopsy. *Id*. at 110-12. The scientist is a recognized expert in firearms identification. *Id*. at 111. She opined that five of the recovered bullets were .380 caliber and fired

---

defendant through the expense of several trials until the prosecutor obtains a result that satisfies him." *Quigley*, 697 N.E.2d at 738 (internal quotation marks and citations omitted). The trial court has discretion to order that one or more charges be tried separately when it is in the interests of justice. 720 ILCS 5/3-3(c).

The record here provides no explanation for why the armed habitual criminal charge was severed from the murder charge. The issue was raised *sua sponte* by the trial court when addressing preliminary matters at the outset of trial immediately before picking a jury. (Dkt. No. 16-3 at 7). The trial judge asked, "I think either the last count or one of the counts right near the end is being charged with armed habitual criminal; you want to sever that for now, State?" *Id*. at 7-8. The prosecutor responded "yes" to the trial court's question. The trial court ordered the severance of the armed habitual criminal count and stated, "we'll try another time if necessary." *Id*. at 8. That is the extent of the discussion of the issue in the record.

from the same gun. *Id*. at 112. Three other recovered bullets were not fired from the same gun that

fired the first five bullets, and an additional four bullets could neither be identified nor eliminated

as being fired from the same gun as the other bullets.[2] *Id*. at 112-13. A .380 caliber cartage was

also recovered at the crime scene. The expert entered the cartage data into a ballistic database but

was unable to make an identification match. *Id*. at 113.

A DNA expert examined the evidence recovered at the crime scene to determine if Riley or

the victim could be connected to any of the items. Riley's DNA did not match any DNA found on

the evidence. *Id*. at 114. Although Hudson's DNA was not a match for any DNA found on items at

the crime scene, the expert concluded that Hudson's DNA could not be excluded as the source of

the DNA found on one of the cups. *Id*.

---

[2] Defense counsel suggested at trial that there may have been more than one gun involved in the shooting. He claimed, "We have the stipulation that a .380-caliber shell casing was recovered and that .38-caliber bullets were recovered from the [victim's] body. If I'm wrong, I apologize, but it was a stipulation which [the prosecutor] and I agreed to." (Dkt. No. 16-5 at 171.) Contrary to defense counsel's claim, the stipulation does not state that a .38-caliber bullet was recovered. But the stipulation does explain that a first set of recovered bullets was fired from the same gun, a second set was not fired from the gun used to shoot the first set of bullets, and it cannot be concluded whether a third set of bullets was fired by the gun used to shoot either of the other two sets of bullets.

The question of whether multiple caliber bullets and casings were recovered also arose during defense counsel's cross-examination of Chicago Police Detective Daniel Gorman. *Id*. at 52. Detective Gorman testified that a .380 spent shell casing was found at the scene and a bullet of a different caliber fell out of the victim's clothes at the scene. *Id*. Detective Gorman conceded that it was a "possibility" that more than one gun was involved in the shooting. *Id*. at 53. Defense counsel also made reference to Detective Gorman's testimony regarding the shell casing and bullet being different calibers in his closing argument to support the view that there may have been more than one gun. *Id*. at 163.

The medical examiner's testimony suggests an alternative scenario, however. The medical examiner testified that bullets from a prior, unrelated injury were also recovered from the victim's body during the autopsy. *Id*. at 90. Those old bullets were in addition to the recovered bullets from the recent shooting that caused the victim's death. The old bullets were not associated with Riley's death but were among the group of bullets sent to the firearms examiner for analysis. *Id*. at 110.

A fingerprint expert also examined the recovered evidence to see if any of the items contained Riley's fingerprints. *Id*. at 116. The expert concluded that most of the recovered items—with the exceptions of one plastic drinking cup and one glass bottle—did not show fingerprints suitable for comparison to Riley's fingerprints. *Id*. For the two items that did allow comparison, Riley's fingerprints were not found on those items. *Id*.

Chicago Police Detective Daniel Gorman and his partner Detective Halloran responded to the shooting. *Id*. at 37. The detectives led the police investigation of the killing. Although both detectives participated in the investigation, only Gorman testified at trial. The police investigation eventually led the detectives to interview Demetrice Allen (also known as "Mimi") at the Chicago Police Department Area One police station on January 8, 2008. *Id*. at 42-43. The interview with Allen resulted in the detectives focusing their investigation on Riley. *Id*. at 44. The detectives also issued investigation alerts for Frederick Brown, Kenneth Head (also known as "Little K"), and Kenneth Gardner. *Id*. An investigation alert is a notification in the police department's computer system that if a police officer stops the individual for an unrelated matter, that individual should be brought to the detectives for questioning. *Id*. at 43. The detectives interviewed Rashee Mackmore, (also known as "Sheeba") on January 11, 2007 and Head on January 23, 2008. *Id*. at 45.

The detectives arrested Riley on March 9, 2008 in front of his home. *Id*. Riley lives a half a block from the vacant lot where Hudson was killed. *Id*. at 46. In addition to arresting Riley, the detectives re-interviewed Allen, Brown, and Head on March 9, 2008. *Id*. at 47-48. A Cook County Assistant State's Attorney participated in the interviews and took written statements from the three men. *Id*.

Two days later on March 11, Riley was taken to a court hearing at the Circuit Court of Cook County Criminal Courts building. *Id*. at 49. Following the hearing, the police detectives returned him to the Area One police station. *Id*. Detective Gorman testified that Riley, on his own, began speaking about the case during the drive back to the police station. *Id*. According to Detective Gorman, Riley "believed it was his friend Sheeba [Mackmore] that identified him as the shooter. And then he said dead men can't come to court and testify." *Id*. at 50. Detective Gorman also testified that Riley told him during the ride that "come trial time, those witnesses would come to court and testify that the police forced them to identify" him. *Id*.

Brown, Allen, and Head were called as prosecution witnesses at the murder trial. Brown and Allen are cousins, who were living together at the time of Hudson's killing. (Dkt. No. 16-4 at 35, 48). Hudson and Allen were best friends. *Id*. at 50. Head was also friends with Hudson, Brown, and Allen. *Id*. at 63. And Brown, Allen, and Head all knew Riley. *Id*. at 35, 64. All three also had prior felony convictions—Brown had a prior narcotics conviction, *id*. at 48; Head had prior convictions for delivery of cocaine and residential burglary, *id*. at 61; and Allen had three prior felony drug convictions and was in custody for violating his probation for a domestic battery conviction at the time he testified, *id*. at 103.

During his testimony, Brown explained that he was standing at the vacant lot with Hudson and Allen at 10:30 p.m. on the night of the shooting. *Id*. at 36. They were among a group of a dozen or so men and women—including Head and Mackmore—drinking and socializing. *Id*. at 38-39. At some point, Brown saw Hudson and Mackmore speaking to each other. *Id*. at 40. At the same time, Brown saw Riley arrive separately from his house across the street. *Id*. at 40-42. Riley was wearing all black, including a hooded sweatshirt (or "hoodie.") *Id*. Riley was walking with his

hands in the hoodie's pockets. *Id*. According to Brown, he witnessed Riley walk up to Hudson and say, "don't talk to my boss like that." *Id*. at 44. Riley then pulled a black gun from the sweatshirt's front pocket and struck a bystander with it. *Id*. at 44-45. Brown then witnessed Riley shoot Hudson once. *Id*. Brown ran from the scene and heard five or six more shots. *Id*. at 45. Although Brown explained that he did not initially speak to the police because he was scared, he did not explain why he was afraid. *Id*. at 51.

Head also testified that Riley shot Hudson. But there were significant differences between Head's testimony and Brown's testimony. Head testified that he was also drinking with the group at the vacant lot around 10:30 p.m. on the evening of the shooting. *Id*. at 66. According to Head, Riley arrived by car with another man instead of walking to the lot from his home as Brown testified. *Id*. at 67. Head further testified that Hudson also arrived in a separate car around the same time that Riley arrived. *Id*. at 68. Hudson walked towards Riley holding up his hands. *Id*. at 68-69. Riley pulled a gun from his back pants pocket and shot Hudson. *Id*. at 69-70. Head saw Riley shoot Hudson once. *Id*. at 70. He then heard five more shots as he fled. *Id*.

Head also admitted to initially lying to the police during his January 23 interview when he told them he did not see the shooting. *Id*. at 74. He explained that he lied because he was scared, but he did not explain why he was scared. *Id*. at 76. Head expressed concern about speaking to the police at that time because he did not have a lawyer present and he could not read any papers presented to him because he was illiterate. *Id*. at 74. Head eventually spoke to the police because he knew he needed to tell the truth. *Id*. at 98-99.

Head was impeached at trial by his March 9 statement. That statement is consistent with Brown's version of events: that Riley walked to the lot wearing a hooded sweatshirt and then shot

Hudson. *Id*. at 81-82. Head further said in the March 9 statement that he saw Riley pull a black handgun from the sweatshirt's front pocket and shoot Hudson while he was talking to Mackmore. *Id*. at 83-84. On cross-examination, however, defense counsel pointed out that the March 9 statement also included that, "Kenneth states he did not go to the police because he was worried about retribution." *Id*. at 86. Defense counsel asked Head to define the word "retribution;" Head responded that he did not know the word. *Id*. Head also conceded that he told the police that he had a fight with the victim on the night of the murder, but claimed he had walked away. *Id*. at 88.

Allen testified that he was present at the lot with Hudson, Brown, Head, and Mackmore, along with several other people. *Id*. at 104-05. According to Allen, however, Riley was not present and Allen did not see Hudson being shot. *Id*. at 106. The prosecution attempted to impeach Allen with his prior statement to the police and Assistant State's Attorney, which was consistent with Brown's statement in stating that Riley shot Hudson because of how Hudson was talking to Mackmore. *Id*. at 111. The major difference between the two statements was that Allen's prior statement said that Riley was wearing a white hoodie, while Brown said it was black hoodie. *Id*. When asked about his prior statement at trial, Allen responded that he could not recall any part of it and he did not provide any in-court testimony implicating Riley.

The prosecution also attempted to impeach Allen with his April 3, 2008 grand jury testimony, in which he again gave a statement consistent with Brown's testimony identifying Riley as the shooter. *Id*. at 116. Allen responded that he could not recall his grand jury testimony. He explained that he was drunk and did not know what happened. *Id*. at 147. He said he signed the written statement that the Assistant State's Attorney wrote in March 2008 because there was a

warrant out for his arrest and he was told that he would go to jail if he did not sign the statement. *Id*. at 148.

Upon the close of the prosecution's case, Riley chose not to testify on his own behalf. (Dkt. No. 16-5 at 120). The defense then rested without presenting any evidence. *Id*.

During closing arguments, the prosecution argued that the jury should reject any concerns about inconsistencies in the witnesses' testimony and prior statements because Riley's statement to Detective Gorman showed his intent to intimidate witnesses. (Dkt. No. 16-5 at 143). The prosecution portrayed Riley as a confident, callous killer who murdered Hudson in front of a dozen witnesses who knew him. *Id*. His callousness extended to the fact that he did not attempt to flee following the shooting, but instead continued to live in his home across the street from the murder scene for many months until his arrest. The prosecution noted that, despite the alleged intimidation by Riley, both Brown and Head identified Riley as the shooter in court. The prosecution also argued that the jury should believe Allen's prior statements to the police and grand jury testimony that implicated Riley.

Defense counsel argued that there was no physical evidence connecting Riley to the crime—*i.e.*, the only evidence was that of the three eyewitnesses Brown, Head, and Allen. *Id*. at 163-64. With the importance of the eyewitnesses established, defense counsel proceeded to attack their credibility. He noted how the eyewitnesses disagreed over: (1) the course of the events; (2) the color of Riley's clothing (black or white); and (3) from where he pulled the weapon (front sweatshirt pocket or back pants pocket). *Id*. at 166. He also pointed out that the credibility of the witnesses was inherently questionable, as they had multiple convictions between them and two of the three were serving prison sentences when they testified, even appearing in court in prison

jumpsuits. *Id*. at 173. Defense counsel also argued that the fact that there might have been more than one gun involved in the shooting impeached the eyewitnesses because they only mentioned one gun in their testimony. *Id*. at 171-72.

Defense counsel also argued that the timeline of the police investigation demonstrated reasonable doubt. *Id*. at 168-70. The police interviewed Allen, Mackmore, and Head in January 2008. *Id*. But the police did not arrest Riley until March 2008. *Id*. Defense counsel noted that there was no explanation for the delay between the January 2008 interviews and the March 2008 arrests. *Id*. The police stated that Riley became the focus of their investigation following the January 2008 interviews. If Riley was the target in January 2008, defense counsel argued, it would seem reasonable for the police to have arrested him at that time. That the prosecution did not provide an explanation for why the police waited until March 2008 to arrest Riley allowed defense counsel to cast doubt on the statements obtained by the police. Defense counsel also pointed out that Head did not even know the meaning of a word that was in his written statement. *Id*. at 170. Finally, defense counsel suggested that Head was the actual killer because he had a fight with the victim on the evening of the killing. *Id*. at 169.

In its rebuttal argument, the prosecution attempted to bolster the credibility of the witnesses. The prosecutor made an argument that he would make again at the subsequent armed habitual criminal trial—with regard to the witnesses' disagreement about whether Riley was wearing black or white clothes, the prosecutor argued, "I have been in front of you now for three or four days. You know I have been wearing a shirt and tie, suit and tie every day. Can you remember what color shirt, what color tie I had on on Monday, Tuesday?" *Id*. at 184-85.

The jury ultimately found Riley not guilty of murder. *Id*. at 220. It also answered a special interrogatory finding that the prosecution had not proved that Riley personally discharged a firearm that proximately caused death to another person during the commission of first-degree murder. *Id*.

B.  **The Armed Habitual Criminal Trial**

Riley's trial on the armed habitual criminal charge occurred three-and-a-half months after his was acquitted on the murder charge. The same trial judge, prosecutors, and defense counsel from the first trial resumed their respective roles for the second trial. Unlike the first trial, the second trial was a bench trial, so the trial judge who presided over the murder trial was now the finder of fact for the armed habitual criminal trial.

The evidence presented at the armed habitual criminal trial was a truncated version of the evidence presented at the murder trial. The prosecution limited its case in the second trial to calling Brown, Allen, and Detective Gorman as witnesses. Their testimony at the second trial was virtually identical to their testimony at the first trial on all material matters. The only new evidence was that concerning Riley's prior two convictions, which was necessary to satisfy the elements of the armed habitual criminal charge. *See* 720 ILCS 5/24-1.7 (criminalizing the receiving, selling, possessing, or transferring of a firearm by an individual previously convicted of two qualifying felonies).

At the second trial, Brown again testified that he was in the vacant lot while Hudson and Mackmore were having a conversation close by. (Dkt. No. 16-6 at 27-28). Riley walked over to the lot from his home across the street wearing a black hoodie with his hands in his pockets. *Id*. Riley approached Hudson and told him, "Don't talk to my boss like that." *Id*. at 30. He then struck a

bystander with a black semi-automatic handgun and shot Hudson. *Id*. at 31. This time, however, Brown testified that he witnessed Riley shoot Hudson two to three times before running. *Id*.

For his part, Allen once again failed to provide in-court testimony implicating Riley. However, instead of saying he did not recall what happened (as he did in the first trial), Allen testified that he did not see whether Riley shot Hudson. *Id*. at 44. The prosecution responded as it did in the first case: by impeaching Riley with his January 2008 statement to police, *id*. at 84-91, and his April 2008 grand jury testimony implicating Riley. *Id*. at 48-64.

The prosecution's final witness was Detective Gorman. As in the murder trial, Detective Gorman explained that his investigation led to his January 2008 interview of Allen and, based on that interview, Riley became the target of the investigation. *Id*. at 75-76. Detective Gorman also testified regarding Riley's purported March 11 comments, when Riley stated that he believed Mackmore identified him as the shooter and expressed his intent to intimidate the witnesses against him. *Id*. at 76-80. Unlike at the murder trial, Head did not testify at the armed habitual criminal trial. Moreover, the prosecution did not present any forensic evidence, such as evidence regarding the gun, DNA, fingerprints, or autopsy.

The closing arguments in the armed habitual criminal trial also mirrored those in the murder trial. The prosecution again argued that the witnesses were credible and defense counsel again challenged the witnesses' credibility. Defense counsel specifically pointed out that one witness claimed Riley was in a black hoodie while the other said he was wearing a white hoodie. *Id*. at 99. Defense counsel also argued that the police did not arrest Riley after the January 2008 interviews that purportedly identified him as the shooter, instead waiting until March 2008.

At no time during the second trial did defense counsel make a motion regarding issue preclusion. He did, however, reference the murder trial during closing arguments, stating "Judge, you know, you talked in the last case about how important at least was circumstantial evidence." *Id*. at 97. The trial judge interrupted defense counsel and informed him, "Every case is different." *Id*. Later in the defense counsel's closing argument, the trial judge and defense counsel had the following exchange:

| | |
|---|---|
| Defense Counsel: | I don't know what I have to argue here except for the fact that both directly and circumstantially a bunch of convicted felons, two of them in this case, three in front of the jury came in and said --- forget about the jury. |
| The Court: | Before you say anything else --- |
| Defense Counsel: | I won't mention that. |
| The Court: | Mr. Wiener [the name of the defense attorney], please. I am hearing the case now. There is no jury here. |
| Defense Counsel: | Yes, you are. |
| The Court: | Whatever occurred before that other jury, that's before the other jury. |
| Defense Counsel: | Means nothing. |
| The Court: | That was a different trier of fact. I am the trier of fact in this case, not the jury. Go ahead. |

(Dkt. No. 16-6 at 99).

Finally, in its rebuttal closing argument, the prosecution rebutted the claim that the eyewitness testimony had been inconsistent regarding Riley's clothing using the same argument that it had used in the murder trial. *Id*. at 100-01 ("Judge, I appear before you every day. Today is Friday. I doubt that you could remember what color tie I had on or what color suit I had on, for that

matter, for the four days of the week."). In finding Riley guilty, the trial judge found the prosecution's witnesses to be credible. *Id*. at 108.

Riley raised the *Ashe* issue for the first time on direct appeal. The state appellate court recognized that the claim was not properly preserved but nonetheless reached the issue through plain error review. *Riley*, No. 1-10-1607, 2012 IL App (1st) 101607-U, at 8 (Dkt. No. 3-1 at 9). Regarding the merits of the *Ashe* claim, Riley argued that the jury's acquittal on the murder charge had a preclusive effect barring conviction on the armed habitual criminal charge. (Dkt. No. 3-1 at 7). According to Riley, when the jury found him not guilty of murder, it not only concluded that he did not shoot and kill Hudson but also that he did not possess a firearm on that evening. *Id*. at 7-8. But the appellate court disagreed with Riley's view. The appellate court explained that the jury in the murder trial only needed to determine if Riley shot and killed Hudson, not whether he possessed a gun. *Id*. at 9-12. The court further found that those were two separate considerations and that the resolution of one (that Riley did not kill Hudson) did not resolve the other (whether Riley possessed a gun).

Riley also argued on appeal that the evidence showed there was only one gun present on the evening in question and it was used to kill Hudson—thus, if Riley did not kill Hudson, then he also did not possess that one gun. The appellate court disagreed with this view as well, pointing out that there was evidence in the record suggesting the presence of more than one gun. *Id*. at 12. Riley now raises the *Ashe* issue in his present habeas corpus petition. (Dkt. No. 3.)

## II. Discussion

### A. Respondent's Forfeiture of Affirmative Defense

Before turning to the merits of Riley's claim, the Court notes that the state appellate court—the last state court to rule on merits of Riley's claim—held that the claim was not properly preserved in the trial court through a contemporaneous objection and timely post-trial motion. *Riley*, No. 1-10-1607, 2012 IL App (1st) 101607-U, at 8 (Dkt. No. 3-1 at 9). Despite Riley's failure to properly preserve the issue, the appellate court went on to review the claim under a plain error standard.

The state appellate court's finding that the claim was not properly preserved at trial—resulting in plain error review—creates a procedural default defense for the respondent. *Miranda v. Leibach*, 394 F.3d 984, 992 (7th Cir. 2005). However, the respondent failed to assert the procedural default, instead answering the claim on the merits. Procedural default is an affirmative defense that can forfeited when the respondent fails to raise it. *Cheeks v. Gaetz*, 571 F.3d 680, 685 (7th Cir. 2009) (citation omitted). That is what has occurred here. The respondent's potential procedural default defense is forfeited, and the Court therefore proceeds to the merits of Riley's claim.

### B. Merits of Riley's Claims

#### 1. The AEDPA Standard

A writ of habeas corpus cannot issue unless the petitioner demonstrates that he is in custody in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a). As the state courts adjudicated Riley's claims on the merits, this Court's review of the present habeas corpus petition is governed by the AEDPA. The Court may not grant habeas relief unless

15

the state court's decision on the merits was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or the state court decision is based on an unreasonable determination of facts. 28 U.S.C. § 2254(d).

"'A federal habeas court may issue the writ under the 'contrary to' clause if the state court applies a rule different from the governing law set forth in [the Supreme Court's] cases, or if it decides a case differently than [the Supreme Court has] done on a set of materially indistinguishable facts.'" *Premo v. Moore*, 562 U.S. 115, 128 (2011) (quoting *Bell v. Cone*, 535 U.S. 685, 694 (2002)). "An 'unreasonable application' occurs when a state court 'identifies the correct legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of Petitioner's case.'" *Rompilla v. Beard*, 545 U.S. 374, 380 (2005) (quoting *Wiggins v. Smith*, 539 U.S. 510, 520 (2003); *Williams v. Taylor*, 529 U.S. 362, 413 (2000)).

"The AEDPA's standard is intentionally 'difficult for Petitioner to meet.'" *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015) (per curiam) (quoting *White v. Woodall*, 134 S. Ct. 1702 (2014); *Metrish v. Lancaster*, 133 S. Ct. 1781, 1786 (2013)). "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). This "'highly deferential standard [] demands that state-court decisions be given the benefit of the doubt.'" *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Woodford v. Visciott*, 537 U.S. 19, 24 (2002) (per curiam)).

16

### 2.     Clearly Established Federal Law Governing Riley's Claim

As mentioned above, *Ashe v. Swenson*, holds that issue preclusion applies in criminal cases pursuant to the Constitution's protection against Double Jeopardy. *Bravo-Fernandez*, 137 S. Ct. at 358. When a jury has returned a not guilty verdict in a prior criminal case, the Court must determine what the acquitting jury "necessarily decided" to arrive at the verdict and then give preclusive effect to that issue in the later trial of the defendant. *Id.* at 359 (citing *Ashe*, 397 U.S. at 444). Issue preclusion only applies to the "determinations that were necessary to support the judgement entered in the first action." *Schrio v. Farley*, 510 U.S. 222, 233 (1994) (internal quotation marks and citations omitted). Thus, in deciding a question of issue preclusion, the Court must determine "whether a rational jury could have grounded its verdict upon an issue other than that which [the petitioner] seeks to foreclose from consideration." *Ashe*, 397 U.S. at 444.

This Court narrowly applies the preclusion doctrine in the criminal setting because of the absence of appellate review of jury acquittals. Preclusion is "premised on 'an underlying confidence that the result achieved in the initial litigation was substantially correct.'" *Bravo-Fernandez*, 137 S. Ct. at 358 (quoting *Standefer*, 447 U.S. at 23 n.18). Appellate review of verdicts, which is available in civil proceedings, is a "key factor" in ensuring that a verdict was correct. *Id.* at 358. However, there is no appellate review of a jury acquittal in a criminal case even when the acquittal is "'based upon an egregiously erroneous foundation.'" *Id.* at 358 (quoting *Arizona v. Washington*, 434 U.S. 497, 503 (1978)). Consequently, the Court must apply "guarded application of the preclusion doctrine in criminal cases." *Id.* at 358 (citing *Standefer v. United States*, 447 U.S. 10, 22-23 n.18 (1980)). As such, "'[t]he burden is on [the petitioner] to demonstrate that the issue whose relitigation he seeks to foreclose was actually decided' by a prior

jury's verdict of acquittal." *Id.* at 359 (quoting *Ashe*, 397 U.S. at 444). A petitioner fails to meet this standard when there are "'any number of possible explanations for the jury's acquittal verdict.'" *Schiro*, 510 U.S. at 233 (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)).

The application of the issue preclusion principle is best illustrated by references to the facts of *Ashe* itself. In that case, six poker players were robbed by a group of masked men. *Bravo-Fernandez*, 137 S. Ct. at 358-59 (citing *Ashe*, 397 U.S. at 439). Bob Fred Ashe, the petitioner, was tried for robbing one of the poker players but was acquitted "'due to insufficient evidence.'" *Id.* at 359 (quoting *Ashe*, 397 U.S. at 439). Following the acquittal, Ashe was tried a second time, this time for robbing a different poker player. *Id.* at 359. He was found guilty based on "'substantially stronger' testimony from 'witnesses [who] were for the most part the same.'" *Id.* (citing *Ashe*, 397 U.S. at 439-40).

In reviewing Ashe's first case, the Supreme Court concluded that there was sufficient evidence before the jury to prove that the robbery occurred. *Ashe*, 397 U.S. at 445. Thus, the "single rationally conceivable issue in dispute before the jury [at the first trial] was whether [Ashe] had been one of the robbers." *Id.* Once the first jury determined that Ashe was not one of the robbers, the state could not force him to 'run the gantlet' [on that issue at a] second [trial]." *Id.* at 446 (quoting *Green v. United States*, 355 U.S. 184, 190 (1957)). Put another way, *Ashe* prohibits the prosecution from using the first trial as a test run on an issue for a second trial. *Id.* at 447 ("In this case the State in its brief has frankly conceded that following the petitioner's acquittal, it treated the first trial as no more than a dry run for the second prosecution: 'No doubt the prosecutor felt the state had a provable case on the first charge and, when he lost, he did what every good

attorney would do—he refined his presentation in light of the turn of events at the first trial.' But this is precisely what the constitutional guarantee forbids." ).

### 3. Riley Is Not Entitled to Habeas Corpus Relief

The *Ashe* Court concluded that the jury in that case "necessarily decided" that: (1) there was a robbery, and (2) Ashe was not one of the robbers. 397 U.S. at 445. Applying this framework to the acquittal in Riley's murder case, the jury necessarily would have decided that: (1) Hudson was murdered, and (2) Riley was not the murderer. Simply put, a rational jury evaluating the evidence necessarily had to decide that Hudson was murdered. The police found Hudson face down in the lot with multiple gunshot wounds, and the autopsy showed he died from those wounds. Given that the evidence clearly demonstrated that Hudson was murdered, in order to acquit him, the jury also necessarily decided that Riley did not commit the murder. The facts that Hudson was murdered and that Riley did not murder Hudson, thus receive preclusive effect.

However, the Court can go no further in identifying facts that were necessarily decided by the jury at the murder trial. It is important to recall that "'[t]he burden is on [the petitioner] to demonstrate that the issue whose relitigation he seeks to foreclose was actually decided' by a prior jury's verdict of acquittal.'" *Bravo-Fernandez*, 137 S. Ct. at 359 (quoting *Ashe*, 397 U.S. at 444). Riley fails to meet this standard when there are "'any number of possible explanations for the jury's acquittal verdict.'" *Schiro*, 510 U.S. at 233 (quoting *Dowling*, 493 U.S. at 352).3

At Riley's murder trial, defense counsel offered the jury several potential bases upon which to find reasonable doubt as to Riley's guilt. These included: (1) that there was no physical evidence tying Riley to the crime; (2) that there was more than one gun present at the shooting; (3)

---

3 In addition, the case is before the Court as a habeas corpus proceeding requiring an additional level of deference under the AEDPA.

that Head was the actual murderer because he had a fight with the victim on the night of the shooting; (4) that there were inconsistencies in the eyewitnesses' statements regarding the color of Riley's clothes, whether Riley drew the gun from his front sweatshirt pocket or back pants pocket, and whether Riley shot Hudson after walking over from his home or immediately after arriving in a car; (5) that the eyewitnesses were coerced into making their prior statements to the police out of fear that they would be arrested if they did not cooperate; (6) that the eyewitnesses lacked credibility because they waited several months before speaking to the police; and (7) that the police and prosecutors investigating the case lacked credibility because there was a multiple month gap between when they obtained the statements that purportedly identified Riley as the shooter and when the police arrested Riley. (Dkt. No. 16-5 at 162-77).

In acquitting Riley of murder, a rational jury could plausibly have concluded that Head was the murderer; that Riley was likely involved in the crime but the prosecution had failed to present sufficient proof from which to find beyond a reasonable doubt that Riley was the shooter due to the lack of physical evidence; or that it was uncertain who the actual murderer was because of the lack of physical evidence and inconsistent eyewitness testimony. It is possible that the jury found the eyewitnesses not at all credible; or perhaps the jury was agnostic as to the credibility of the eyewitness testimony (or even believed the eyewitnesses), but still wanted physical evidence to confirm it.

In the end, the only facts that can be given preclusive effect from the murder trial verdict are that Hudson was murdered and that Riley was not the murderer. Any facts found by the jury beyond those two cannot be ascertained in light of defense counsel's successful arguments in favor of reasonable doubt and the underlying weakness of the prosecutor's case due to the lack of

physical evidence and inconsistencies in the eyewitnesses' statements. *Schiro*, 510 U.S. at 233-34

(holding that issue preclusion did not apply because there were multiple possible grounds to

support the jury verdict, and the record was unclear as to which ground the jury relied upon);

*Dowling*, 493 U.S. at 352 (same).

Having identified the two facts from Riley's murder trial that must be given preclusive

effect, the Court next must determine whether the required issue preclusion bars Riley's

subsequent conviction as an armed habitual criminal. It does not. That Riley did not murder

Hudson has no impact on whether Riley possessed a gun in violation of the armed habitual

criminal statute. The finder of fact at the armed habitual criminal trial was free to believe the

eyewitness testimony that Riley possessed a firearm while having two prior qualifying

convictions. Thus, Riley's conviction for being an armed habitual criminal created no *Ashe*

violation in this case.[4]

The Court recognizes that *Ashe* contains language that, at first blush, appears helpful to

Riley's cause here. Specifically, *Ashe* condemned the prosecution's attempt in that case to use the

first trial as a dry run for the second trial. In reviewing the record in Riley's case, it may seem like

the prosecution did the same here. Most notably, Head was not called as a witness in the second

trial. That allowed the prosecution to avoid two of defense counsel's strongest arguments from the

first trial: that Head was the real killer and that his testimony was inconsistent with the testimony

---

4 The outcome of this case might very well be different if the jury acquitting Riley of murder necessarily
decided that the eyewitness and police officer testimony was not credible. The subsequent prosecution in
the armed habitual criminal case was based entirely on the testimony from those witnesses and the trial
judge, as the finder of fact, found those witnesses credible when finding Riley guilty. As the jury that
acquitted Riley could have "grounded its verdict upon an issue other than" witness credibility, there is no
preclusive effect regarding that issue in the armed habitual criminal trial. *Ashe*, 397 U.S. at 444.
Consequently, the trial judge was free to make his own credibility determinations of the witnesses in the
first instance at that second trial.

from Allen and Brown. By proceeding with only Brown and Allen as eyewitnesses in the second trial, the prosecution was able to present a more consistent version of events. Furthermore, the prosecution did not present any forensic evidence at the second trial, which allowed it to shortcut any ambiguity about whether there was one gun or multiple guns. Notably, while defense counsel failed to expressly raise the *Ashe* issue at the second trial, he seemed to recognize its shadow over the proceedings when he mentioned the prior jury in his closing arguments.

Whatever concerns these circumstances may raise, *Ashe* prohibits affording preclusive effect beyond the two issues that were necessarily decided by the jury in acquitting Riley. To apply issue preclusion to any additional issues would conflict with controlling Supreme Court precedent. *See Dowling*, 493 U.S. at 348 (declining "to extend *Ashe v. Swenson* and the collateral-estoppel component of the Double Jeopardy Clause to exclude in all circumstances, [] relevant and probative evidence that is otherwise admissible under the Rules of Evidence[,] simply because it relates to alleged criminal conduct for which a defendant has been acquitted."). Although the second trial was in many ways a replay of the first trial, that circumstance, by itself, does not violate the Double Jeopardy Clause. Instead, the language in *Ashe* prohibiting the prosecutor from using a first trial as a dry run must be read within the context of *Ashe's* holding that preclusive effect is only given to facts that are necessarily decided by the first trial.

Riley's arguments to the contrary cannot salvage his habeas petition. He argues that the state appellate court decision denying his claim neither cited to, nor discussed, the *Ashe* standard. But this Court presumes that state courts know and follow the law. *Woods*, 135 S. Ct. at 1377. Consequently, the state court need not cite to, nor be aware of, the controlling Supreme Court precedent as long as its result does not contradict the Supreme Court decision. *Early v. Packer*, 537

U.S. 3, 8 (2002) (per curiam). As explained above, the state appellate court decision at issue here is neither contrary to, nor an unreasonable application of, *Ashe*. Thus, that court's failure to cite to or discuss *Ashe* is of no moment.

Riley also argues that the state court applied too technical of an approach to his claim and improperly applied *Blockburger v. United States*, 284 U.S. 299 (1932). The former argument arises from the fact that the state appellate court discussed the elements of the murder and armed habitual criminal charges when evaluating his issue preclusion claim. However, under *Ashe*, a court may review any part of the record, including the charges at issue. *Bravo-Fernandez*, 137 S. Ct. at 359 (citing *Ashe*, 397 U.S. at 444). A fair reading of the state appellate court's opinion shows that the court was considering the charges, which it may properly due, within the context of deciding whether issue preclusion applied to Riley's case. The state appellate court made no error in this regard.

Moreover, Riley's reference to *Blockburger* is inapposite. The *Blockburger* test addresses the question of whether two separate criminal charges actually constitute the same offense for purposes of Double Jeopardy. *Boyd v. Boughton*, 798 F.3d 490, 493-94 (7th Cir. 2015) (explaining that the *Blockburger* test "asks whether each offense requires an element that is not required by the other: if not, then the two are the 'same offense'"). The *Blockburger* test does not apply to issue preclusion under *Ashe*, as issue preclusion can apply to different charges brought against the same defendant. *Brown v. Ohio*, 432 U.S. 161, 166 n.6 (1977). The state appellate court did not apply the *Blockburger* test as Riley argues. If it had done so, it would simply have held that the elements of the murder and armed habitual criminal statutes were different and that would have ended the analysis, as that is all that is required under *Blockburger*. Instead, the state appellate court

considered whether a fact was necessarily decided by the murder acquittal that would have preclusive effect on the armed habitual criminal trial. It is clear that the state appellate court considered the charge—which it was properly allowed to do—within the context of the *Ashe* analysis.

Finally, Riley argues that the jury's decision to acquit him of the murder charge necessarily includes a finding that he did not possess a firearm that would preclude his later conviction as an armed habitual criminal. Riley's argument assumes that the testimony showed there was only one gun at the scene when Hudson was killed, and therefore the person who shot and killed Hudson must have possessed and used that gun. Put another way, Riley believes that by acquitting him of murder, the jury also necessarily concluded that he did not possess a gun. But a person can possess a gun yet not be a murderer. And, as discussed above, the jury's verdict of not guilty on the murder charge cannot be extended to the issue of whether Riley possessed a gun. Interestingly, Riley's contention that there was only one gun at the crime scene is based on arguments made by the *prosecution* at his murder trial. Riley's own attorneys took the opposite position at that trial—arguing that there possibly were multiple guns present. As the jury acquitted Riley on the murder charge, one might consider it more likely that the jury was persuaded by defense counsel's argument on this point than the prosecution. But ultimately, it does not matter how many guns were present, as the jury cannot be said to have necessarily decided anything on this point.

In sum, as the jury at the murder trial was presented with a number of theories and arguments by defense counsel, it cannot be determined what it decided regarding those theories when finding Riley not guilty. The only issues that were necessarily decided by the acquittal on the murder charge are that Hudson was murdered and that Riley was not Hudson's murderer. The

finding of these two facts by the jury did not preclude Riley's subsequent prosecution as an armed habitual criminal, which, in turn, did not violate the constitutional prohibition against Double Jeopardy as explained by *Ashe v. Swenson*, 397 U.S. 436 (1970). Thus, the state appellate court's decision rejecting Riley's claim is neither contrary to, nor an unreasonable application of, *Ashe*. Riley's habeas corpus petition is therefore denied.

## III.    Certificate of Appealabilty

Notwithstanding the above, the Court appreciates that the evidence at Riley's armed habitual criminal trial was virtually the same as the evidence presented at his earlier murder trial. Despite this, two finders of fact reached arguably conflicting results. This circumstance appears to implicate language in *Ashe* prohibiting a prosecutor from using a first trial as a dry run for a second trial. For this reason, the Court finds that Riley can make a substantial showing of the denial of a constitutional right and that "reasonable jurists could debate whether the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." 28 U.S.C. § 2253(c); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal quotation marks and citations omitted). A certificate of appealability is appropriate.

## IV.    Conclusion

For the reasons discussed above, Riley's habeas corpus petition (Dkt. No. 3) is denied on the merits. The Court grants a certificate of appealability on the issue of whether the constitutional prohibition against Double Jeopardy as explained by the Supreme Court in *Ashe v. Swenson*, 397 U.S. 436 (1970), was violated by Riley's conviction as an armed habitual criminal when he was acquitted in a related murder prosecution. Riley is advised that this is a final decision ending his

case in this Court. If he wishes to appeal, he must file a notice of appeal with this Court within 30 days of the entry of judgment. *See* Fed. R. App. P. 4(a)(1). Riley need not bring a motion to reconsider this Court's ruling to preserve his appellate rights. If Riley wishes the Court to reconsider its judgment, however, he may file a motion under Federal Rule of Civil Procedure 59(e) or 60(b). Any Rule 59(e) motion must be filed within 28 days of the entry of this judgment. *See* Fed. R. Civ. P. 59(e). The time to file a motion pursuant to Rule 59(e) cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A timely Rule 59(e) motion suspends the deadline for filing an appeal until the Rule 59(e) motion is ruled upon. *See* Fed. R. App. P. 4(a)(4)(A)(iv). Any Rule 60(b) motion must be filed within a reasonable time and, if seeking relief under Rule 60(b)(1), (2), or (3), must be filed no more than one year after entry of the judgment or order. *See* Fed. R. Civ. P. 60(c)(1). The time to file a Rule 60(b) motion cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A Rule 60(b) motion suspends the deadline for filing an appeal until the Rule 60(b) motion is ruled upon only if the motion is filed within 28 days of the entry of judgment. *See* Fed. R. App. P. 4(a)(4)(A)(vi).

ENTERED:

Dated: March 28, 2017

_____
ANDREA R. WOOD
United States District Judge

26